

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

In the Matter of the Care and Treatment ）
of GREGORY PARR, a/k/a GREGORY ）
A. PARR, ）
                        Appellant, ）
                                 ）
v. ）    **WD77959**
                                 ）
STATE OF MISSOURI, ）    FILED: March 1, 2016
                      Resondent. ）

### Appeal from the Circuit Court of Jackson County
### The Honorable Kathleen A. Forsyth, Judge

### Before Division Four: Alok Ahuja, C.J., and Karen King Mitchell and Gary D. Witt, JJ.

Following a jury trial, Gregory Parr was found to be a sexually violent predator ("SVP") under § 632.480, RSMo, and was committed to the custody of the Department of Mental Health. Parr appeals, arguing that the evidence was insufficient to establish that he was an SVP. We affirm.

### Factual Background

Gregory Parr has an admitted history of sexual offenses against minors, dating back to an incident in 1972 when he was fourteen, and victimized a six-year-old girl. In 1992, Parr pled guilty to sodomy stemming from the sexual abuse of a minor male. He was sentenced to ten years in the Missouri Department of Corrections, with execution of the sentence suspended. Parr

completed five years of probation for that offense in 1997.[1]  In 2001, he pled guilty to two counts of second-degree child molestation and three counts of second-degree statutory sodomy for acts committed against a fourteen-year-old boy, and was sentenced to a total of ten years in the Department of Corrections.

In 2009, as Parr's release date approached, the State attempted to have him civilly committed as a sexually violent predator under § 632.480, RSMo.  Dr. Steven Mandracchia was the State's only witness at the 2009 trial.  He testified that although Parr suffered from pedophilia, in Dr. Mandracchia's opinion Parr did not meet the requirements for SVP confinement.  The probate court granted Parr's motion for a directed verdict at the close of the State's evidence, and Parr was conditionally released in April 2009.

Parr's parole was revoked in April 2010.  The revocation stemmed in large part from a letter Parr wrote to a fellow sex offender who remained incarcerated.  Parr wrote the five-page letter over a period of multiple weeks.  While the letter contained numerous everyday observations, it also contained frank sexual language, photographs of one of Parr's victims and of "an eighteen-year-old [male] porn star," and a description of Parr's sexual arousal on encountering or viewing images of males who were, or appeared to be, minors.  In the letter, Parr also described his efforts to locate images of the other sex offender's victim to send to the offender.

In 2012, the State again filed a petition to have Parr committed as an SVP.  Parr moved to dismiss the petition, arguing that in light of the 2009 judgment, collateral estoppel barred the State's 2012 petition.  The State responded that new evidence justified the subsequent petition.

---

[1]      Parr violated his probation in 1994 when he made an unsupervised visit to his victim.  He was placed on electronic monitoring for the remainder of the probationary period.  Parr claimed he was unaware that the visit was prohibited.

The probate court agreed and denied Parr's motion to dismiss. The court stated that it would permit the State to prosecute the new petition, so long as the State could prove that Parr had experienced a change in circumstances since the 2009 proceeding. The court determined that whether such a change of circumstances had occurred was a question for the fact-finder.

Following a jury trial, Parr was determined to be an SVP and was committed to the custody of the Department of Mental Health. He now appeals.

**Standard of Review**

> In an SVP case, our review is limited to a determination of whether there was sufficient evidence admitted from which a reasonable fact finder could have found each necessary element by clear and convincing evidence. This Court does not reweigh the evidence. We determine only whether the judgment was supported by sufficient evidence. Matters of credibility and weight of testimony are for the fact finder to determine. The evidence is viewed in the light most favorable to the judgment, accepting as true all evidence and reasonable inferences favorable to the judgment and disregarding all contrary evidence and inferences. A judgment will be reversed on insufficiency of the evidence only if there is a complete absence of probative facts supporting the judgment.

*In re Gormon*, 371 S.W.3d 100, 103-04 (Mo. App. E.D. 2012) (citations omitted); *see also*, *e.g.*, *Walker v. State*, 465 S.W.3d 491, 493-94 (Mo. App. W.D. 2015); *Boughton v. State*, 437 S.W.3d 368, 373 (Mo. App. S.D. 2014).

**Analysis**

The relevant portion of § 632.480(5), RSMo defines a sexually violent predator as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility and who . . . [h]as pled guilty or been found guilty in this state or any other jurisdiction . . . of a sexually violent offense." Section 632.480(2), RSMo defines a "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to

3

commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others."

In his sole Point on appeal, Parr argues that the evidence at trial was insufficient to prove clearly and convincingly that he satisfied these statutory standards.

**I.**

The circuit court held that the 2009 judgment, which found that the State had failed to prove that Parr was an SVP, did not preclude the State from filing a new petition in 2012, seeking to have Parr involuntarily committed. Parr does not directly challenge that conclusion on appeal. Nevertheless, his sufficiency-of-the-evidence argument is based in substantial part on the contention that the State could not rely on pre-2009 events to prove its case. We disagree.

"Collateral estoppel, or issue preclusion, is used to preclude the relitigation of an issue that already has been decided in a different cause of action." *Brown v. Carnahan*, 370 S.W.3d 637, 658 (Mo. banc. 2012) (citing *Sexton v. Jenkins & Assocs., Inc.*, 152 S.W.3d 270, 273 (Mo. banc 2004)). In order to invoke the doctrine of collateral estoppel, a court must determine "(1) whether the issue decided in the prior adjudication was *identical* with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication," and (4) "whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit." *Newton v. Ford Motor Co.*, 282 S.W.3d 825, 833 (Mo. banc 2009) (quoting *Oates v. Safeco Ins. Co. of Am.*, 583 S.W.2d 713, 719 (Mo. banc 1979)).

The issues were not identical in the 2009 and 2012 proceedings, and collateral estoppel therefore does not categorically bar the State from prosecuting the 2012 petition. The statute defines an SVP as "any person who *suffers* from a mental abnormality." § 632.480(5), RSMo

4

(emphasis added). The use of the present tense indicates that it is the individual's *current* mental state that is to be considered. In addition, the statute explicitly recognizes that an individual's status as an SVP may change over time, since it provides that a person found to be an SVP will be committed to the custody of the Department of Mental Health "until such time as the person's mental abnormality has so changed that the person is safe to be at large." *See* § 632.495(2), RSMo. Whether Parr met the criteria to be considered a sexually violent predator in 2009 is not the same question as whether or not he met the statutory definition in 2012.

Missouri cases recognize that an earlier judgment addressing a legal issue will not preclude later litigation of the same issue, if the facts have materially changed between the first and second adjudications. As we explained in *Sangamon Associates, Ltd. v. Carpenter 1985 Family Partnership Ltd.*, 280 S.W.3d 737 (Mo. App. W.D. 2009), collateral estoppel

> extends "'only to the facts in issue as they existed at the time the judgment was rendered, and does not prevent a reexamination of the same questions between the same parties where in the interval the facts have changed or new facts have occurred which may alter the legal rights or relations of litigants.'" *Farrow v. Brown*, 873 S.W.2d 918, 921 (Mo. App. E.D. 1994) (quoting *Elam v. City of St. Ann*, 784 S.W.2d 330, 334 (Mo. App. E.D. 1990)). However, the Supreme Court has cautioned that

> > "[t]he mere change of facts subsequent to the rendition of a judgment does not necessarily affect the operation of such judgment under the doctrine of *res judicata*. . . . However, where, after rendition of a judgment, subsequent events occur, creating a new legal situation or altering the legal rights or relations of the litigants, the judgment may thereby be precluded from operating as an estoppel. In such case, the earlier adjudication is not permitted to bar a new action to vindicate rights subsequently acquired. In this connection, it has been declared that a judgment is not *res judicata* as to rights which were not in existence at the time of the rendition of the judgment."

> *City of Hardin v. Norborne Land Drainage Dist. of Carroll County*, 360 Mo. 1112, 232 S.W.2d 921, 925-26 (1950) (citation omitted).

*Sangamon*, 280 S.W.3d at 744-45.[2]  Under these principles, "the question becomes whether [the State's 2012 petition] is seeking relief based on subsequent events, which have created a new legal situation or altered the legal rights or relations of the parties, or instead whether it seeks [relief] based on the same grounds considered – and rejected – in [the 2009 proceeding]." *Id.* at 745.[3]

Although the applicability of collateral estoppel to successive SVP commitment proceedings has not previously been addressed in Missouri, courts in other states have decided the issue.  While not binding, these out-of-state decisions "may be persuasive when the facts are similar, and when they are based on sound principles and good reason." *Conrad v. Waffle House, Inc.*, 351 S.W.3d 813, 822 n. 8 (Mo. App. W.D. 2011).  This is particularly true where, as here, the out-of-state decisions are consistent with Missouri's collateral estoppel caselaw.

The California Court of Appeal's decision in *Turner v. Superior Court*, 130 Cal. Rptr.2d 300 (2003), is instructive.  In *Turner,* appellant James William Turner was released in 2001 following a two-year commitment under the state's Sexually Violent Predator Act ("SVPA").  Turner's 2001 release was premised on a jury's finding that he was no longer "a danger to the health and safety of others and was not likely to engage in acts of sexual violence upon his release, and therefore that he was not a sexually violent predator." *Id.* at 304.  Three months after his release Turner's parole was revoked. *Id.*  While he was in custody for the parole

---

[2]  The quoted passage specifically addresses the applicability of a separate preclusion doctrine:  *res judicata* or claim preclusion.  Immediately after the quoted passage, however, *Sangamon* states that these principles applied to the appellant's preclusion argument, "[w]hether viewed under principles of *res judicata* or collateral estoppel."  280 S.W.3d at 745.

[3]  Federal courts apply a similar standard.  *See Montana v. United States*, 440 U.S. 155, 159 (1979) ("changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues"); *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1319-20 (11th Cir. 2012); *B–S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 663 (10th Cir. 2006); *Baby Dolls Topless Saloons, Inc. v. City of Dallas, Tex.*, 295 F.3d 471, 478-79 (5th Cir. 2002); *Hickerson v. City of N.Y.*, 146 F.3d 99, 112 (2d Cir. 1998); *see also* RESTATEMENT (2D) OF JUDGMENTS § 27, comment c (1982).

violation, the district attorney again attempted to have him committed as a sexually violent predator, "primarily based on facts that had been before the jury in the prior trial when the jury found Turner was not a sexually violent predator." *Id.* at 305. The trial court held that the State's renewed effort to have Turner committed was not barred by the 2001 jury finding. *Id.* Turner then petitioned the appellate court for a writ of mandate ordering that the case be dismissed. *Id.* at 306.

The Court of Appeal held that the jury finding that Turner was not an SVP in 2001 did not absolutely bar the State's later attempt to have him committed.

> [T]he critical question here is the extent to which the issue litigated and decided at the June 2001 trial – the likelihood of Turner committing violent sexual acts upon his release – was the same as the issue presented at the February 2002 probable cause proceeding. Under the SVPA, a determination of SVP status depends on whether the person "'*currently*'" suffers from a diagnosed mental disorder which prevents him from controlling sexually violent behavior and makes him dangerous and likely to reoffend. . . . [¶] . . . Given the SVPA's requirement that the individual's *current* dangerousness be established, the issue of Turner's mental health and his resulting danger to others in February 2002 is not identical to the issue litigated in the prior proceeding and was not decided at the earlier trial. The likelihood of a person committing criminal acts because of a mental disorder is not a fixed condition because an individual's mental health and potential dangerousness can, and frequently does, change. Recognizing this, courts generally hold that an adjudication of status or mental health issues is not conclusive as to the same status on a later date.

130 Cal. Rptr.2d at 309-10 (citations omitted, emphasis in original). Courts in other States have similarly held that a subsequent petition to have a person involuntarily committed as a sexually violent predator is not categorically prohibited by an earlier, unsuccessful petition. *See In re Thomas R.*, 233 P.3d 1158, 1164 (Ariz. App. 2010); *In re Care & Treatment of Sporn*, 215 P.3d 615, 620 (Kan. 2009); *Commonwealth v. Chapman*, 825 N.E.2d 508, 514 (Mass. 2005).

Although an earlier, unsuccessful SVP petition does not absolutely prohibit the filing of a later petition, this does not give the State *carte blanche* to file a new petition whenever an earlier SVP petition is unsuccessful. As we stated in *Sangamon*, to avoid preclusion based on an earlier

7

adverse judgment, a plaintiff must identify "subsequent events, which have created a new legal situation or altered the legal rights or relations of the parties." 280 S.W.3d at 745. Or, in the language of *Turner*, in the later proceeding the State "must present evidence of a change of circumstances, *i.e.*, that despite the fact the individual did not possess the requisite dangerousness in the earlier proceeding, the circumstances have materially changed so that he now possesses that characteristic." 130 Cal. Rptr.2d at 311.[4]

The requirement that the State demonstrate a material change in circumstances, or a "new legal situation," is not insignificant. Indeed, this standard was not satisfied in *Turner* itself: "[t]he mere fact that the district attorney's two experts recognized that Turner violated his curfew [subsequent to the earlier judgment] is insufficient to show that these psychologists relied on this violation to reach their conclusions regarding the likelihood that Turner would commit sexually violent predatory offenses upon his release." 130 Cal. Rptr.2d at 313; *see also Sporn*, 215 P.3d at 620 (evidence that offender had "view[ed] pornography and sexually explicit websites on the computer" was insufficient to justify new petition, where the State "ma[de] no allegation that Sporn's mental status or recidivism risk had materially changed since his [earlier] favorable jury verdict").[5]

We reject Parr's contention that, in any subsequent SVP proceeding, the State may *only* rely on actions or events which occurred *after* the earlier adjudication. Of course, the State must

---

[4] These "subsequent events" or "changed circumstances" must have occurred or arisen *subsequent to the first adjudication*. This standard would not be satisfied by newly discovered evidence which existed, and could have been presented, in the earlier proceeding. *Fido's Fences, Inc. v. Radio Systems Corp.*, 999 F. Supp.2d 442, 458 (E.D.N.Y. 2014) ("A party cannot avoid collateral estoppel on an issue merely by asserting additional facts . . . that it could have argued in the prior action.").

[5] *Cf. Sangamon*, 280 S.W.3d at 748 ("The bare assertion that a course of supposedly wrongful actions by [the defendant] had 'continued, unabated and without interruption,' since before the [earlier adjudication]" was insufficient to avoid the preclusive effect of the earlier judgment, "without a showing that the legal situation has changed" in the interim).

meet the burden of demonstrating materially changed circumstances, or a new legal situation, since the prior adjudication. But so long as this standard is satisfied, the State is not prohibited from relying (in part) on facts which predated the earlier adjudication. *Turner* rejected the claim "that historical information is no longer relevant" in a subsequent SVP trial, and noted that "[a] mental health professional cannot be expected to render opinions as to current status without fully evaluating background information." 130 Cal. Rptr.2d at 311. Information pre-dating an earlier adjudication cannot be the *sole* basis for arguing that an individual qualifies as an SVP, however, since if that were the case, the issue would be identical to the question previously litigated, and collateral estoppel would apply. Instead, "[t]he professional must explain what has occurred in the interim to justify the conclusion the individual currently qualifies as a sexually violent predator." *Id.*[6]

## II.

With these legal standards in mind, we turn to the evidence presented at trial to determine whether the State presented sufficient evidence to establish clearly and convincingly that Parr met the statutory definition of an SVP, based on a material change in circumstances since his 2009 SVP trial.

The principal new information on which the State relied at trial was the content of the five-page letter Parr wrote to another sex offender who remained incarcerated. The letter revealed multiple circumstances supporting an SVP finding. Parr's letter referred to several young male entertainment stars, who were or appeared to be below the age of majority. Parr

---

[6] *Accord*, *Thomas R.*, 233 P.3d at 1164 ("When successive petitions are filed, they are not barred by res judicata or collateral estoppel even if prior evidence is introduced provided the State alleges changed circumstances since the last unsuccessful petition."); *Sporn*, 215 P.3d at 620; *Chapman*, 825 N.E.2d at 515 (Commonwealth not precluded from establishing grounds for commitment as a sexually dangerous person where it relied "not only on Chapman's criminal history and sexual misconduct prior to [an earlier adjudication in] 1991, but also on conduct engaged in thereafter").

remarked on the stars' attractiveness and the sexual arousal he experienced on viewing their images. Parr included in his letter several photographs of young males, including photographs of a teenage martial artist, an 18-year-old star of pornographic films, and one of his former victims. With regard to the picture of the porn star, Parr stated that "[t]he picture that appeared below the one here was him getting ready to put 'something' in his mouth and he looked like a young boy it was really cute. Sorry to tease you like this."[7] Parr stated that he was still attracted to his victim, and stated that "[e]very time I open this letter I get to look at [Parr's victim] so you may never get the letter because I love looking at him." Parr asked his correspondent for his preferences, because "I can usually find any picture you may be interested in"; Parr also indicated that he was looking for photographs of his fellow offender's victim to send to him. The letter speaks in frank sexual terms about the teenage characters in the movie "The Squid and the Whale," and describes multiple incidents in which male characters in the movie masturbated to the point of ejaculation. Parr's letter described a meeting with a male in whom he was romantically interested; he stated that "[e]ven though he's 21 he still looks 16," and "has a cute boyish body . . . and some very pretty legs."

Following the discovery of Parr's letter to his fellow offender, Parr was terminated from an outpatient sex offender treatment program in which he was then participating. The therapist

----

[7] Parr's letter makes clear that he was aware of the need to write euphemistically, to avoid providing authorities with information which could be used against him. Parr wrote:

> Sorry for the confusion on some of the things I write to you. I am paranoid about information gather[er]s and try to not give too much information about some things because little bits of info can mean nothing until they are put together and then they can bury someone. I will try to not elude [*sic*] to things so much[.] I am used to info gather[er]s from my military days and tend to hold back on information.

Later, Parr refers to information available on certain male porn stars' internet profiles, and states "[a]nd yes 7 & 5.5, etc refers to their size." He then continues:

> I was attempting to give you information without giving you or the info collectors information, which I am sure you can understand. I hope without going any further this makes sense to you because self-protection is key don't you agree?

who terminated Parr's participation concluded that he had "made no progress in treatment and is not amenable to treatment in the community at this time."

Parr admitted at trial that the letter, and the actions described in the letter, violated multiple conditions of his parole, including associating with felons; using the internet for purposes other than looking for work; viewing or collecting pictures of young boys for sexual arousal; visiting the Facebook and MySpace social media websites; and searching the internet for pornography and viewing pornography.

The State called two witnesses at trial, Drs. Amy Griffith and Eric Jensen, both of whom possess a Ph.D. in psychology. At the time of trial, Dr. Griffith was the clinical director of Missouri's sex offender treatment program. She opined that, although Parr completed all of the requirements of Missouri's sex offender treatment program, "he had not successfully integrated or applied treatment concepts." Dr. Griffith based this opinion largely on the contents of Parr's letter. In her opinion the letter indicated that Parr was "not applying many of the strategies that he claimed to have learned in treatment and . . . he's allowing himself to go down a path that he acknowledged during [her] interview could lead to reoffense." Dr. Griffith testified that she did not believe Parr had integrated any of the strategies or concepts taught in sex offender treatment, since the letter indicated that he was "actively pursuing deviant sexual interests, [and] encouraging another sexual offender to pursue his deviant sexual interests"; "he was engaging in a continued discussion with another sex offender about young boys, which are the targets of his sexual interests." Dr. Griffith expressed concern that, during their interview, Parr failed to recognize or acknowledge that the behaviors described in the letter "were part of his deviant cycle," which "leads to high risk situations" "and eventually reoffending." Dr. Griffith also testified that, when she interviewed him, Parr did not demonstrate insight into his offenses, but

instead stated that "[h]is . . . reason for offending was that he was trying to pleasure the boys who he perceived as being mistreated," and "from dysfunctional homes."

Dr. Jensen testified that in his opinion Parr met all of the requirements to qualify for civil commitment. Dr. Jensen diagnosed Parr with the mental abnormality of pedophilic disorder, meaning that Parr both entertains deviant pedophilic fantasies and acts on them. Dr. Jensen's diagnosis was based primarily on Parr's offense history.

Dr. Jensen testified that he used the Static 99R actuarial instrument to assess Parr's risk of re-offense. Using that instrument, Parr scored "in the moderate/high risk category," placing him in the 74th to 85th percentile among sex offenders.

Dr. Jensen testified that the two most significant factors which decrease a person's risk of reoffense "are completion of a sex offender treatment program and getting old." Although Parr was 56 at the time of trial and had completed the Missouri sex offender program, Dr. Jensen did not believe his risk of reoffense had fallen. In coming to this conclusion, Jensen cited specifically to "his current behavior, behavior within the last couple of years," and testified that Parr's recent behavior "separates him from the average aging sex offender." Referring to the actions described in Parr's letter, Dr. Jensen testified that Parr's "behavior in the community, while not an offense, is indicative of extremely high risk behavior that is atypical, it's not like the average 55 to 60 year old." The behaviors demonstrated by the letter included "downloading pictures of boys that he found sexually attractive and arousing," "searching the internet for pornography of young boys," "associating with a felon," and providing that felon with photographs of an individual identified as Parr's most recent victim. The fact that Parr engaged in such behavior after completing Missouri's sex offender treatment program, while enrolled in an outpatient treatment program, and after a significant legal sanction for his crimes, indicated to

12

Dr. Jensen that Parr had received no benefit from treatment and was at an atypical risk to reoffend. Dr. Jensen characterized this as "a very significant factor."

Dr. Jensen also noted that Parr had testified in deposition that he did not believe his letter demonstrated that he had engaged in "high risk" behaviors, and that he considered "high risk" behavior to consist solely of being in the presence of minors. According to Dr. Jensen, this demonstrated that Parr had not internalized any of the sex offender treatment he had been provided. Dr. Jensen also noted that, in openly discussing his sexual desires and interests with the other offender, Parr demonstrated that he was "offense tolerant"; by having this attitude, Parr was "giving [him]self permission to do a whole lot of behaviors that are very risky indeed, and I think point to well within the more likely than not category of reoffending." Dr. Jensen testified that Parr's letter demonstrated a "sexual preoccupation," which "means every waking moment basically you interpret the world in sexual terms, which if you're not aware of your own risk factors and you're not in the company of somebody, can lead you . . . to engage in dangerous sexual behaviors." Dr. Jensen testified that "what he did to get himself violated in 2010 [was] critical" to Dr. Jensen's evaluation.

Dr. Jensen also testified that the numerous complaints that Parr made while incarcerated in the Jackson County Detention Center indicated that he was engaging in "internal grievance thinking." Dr. Jensen associated Parr's writing of grievances while incarcerated with the thought patterns that had allowed him to rationalize his sexual offenses:

> [O]ne of the reasons that he wanted to in his own opinion offend against children is because he felt bad for the children that he thought had been abused and he thought maybe through his kindly grooming he could help rehabilitate them, and that's a kind of standard-bearing that I think is at play here; in other words, you take up the standard or the torch for other people . . . .

Parr testified on his own behalf, and also called two expert witnesses. The first, Dr. Steven Mandracchia – who also testified in Parr's 2009 trial – admitted that he had not reviewed

13

Parr's records or activities since evaluating him in 2009. The second, Dr. Jeanette Simmons, evaluated Parr in 2012. Dr. Simmons agreed with the State's experts that Parr suffers from pedophilia, and she agreed with Dr. Jensen that Parr fell within the "moderate/high category of risk" using the Static 99R actuarial instrument. Dr. Simmons disputed, however, that Parr's 2010 letter exhibited "high risk" behavior. According to Dr. Simmons, the letter did not indicate "that reoffense was imminent," although she acknowledged that "certainly he was playing with things that were, that could very easily slip into a higher risk situation if he wasn't careful." Dr. Simmons' ultimate conclusion was that Parr was *not* more likely than not to commit future sexually violent offenses if not committed.

Parr does not challenge the State's evidence that he suffered from a "mental abnormality" within the meaning of §§ 632.480(2) and (5), RSMo. Instead, he argues solely that the State failed to prove by clear and convincing evidence that, due to his mental abnormality, he was "more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility." § 632.480(5), RSMo. In making this argument, Parr emphasizes that his parole was revoked in 2010 for "technical" violations, that the State did not prove that he had committed a sexual offense after 2009, that the letter Parr wrote in 2010 "did not contain child pornography," and that Dr. Griffith acknowledged that Parr did not present an "imminent" risk of reoffending.

Parr's specific attacks on the evidence do not justify reversal. Although his parole violations may have been denominated "technical," both of the State's experts testified that those violations were significant, and reflected that Parr had not benefited from the sex offender treatment provided to him, and was engaging in high-risk behaviors which constituted part of his "deviant cycle," and could ultimately lead to reoffense. Dr. Jensen specifically testified that the behavior which led to the revocation of Parr's parole constituted "extremely high risk behavior"

14

which was "atypical" of a sex offender of Parr's age, and constituted "a very significant factor" supporting Dr. Jensen's opinions. As to Parr's remaining arguments, he cites no authority which requires that he have committed a new sexual offense after 2009, that he actually have provided his fellow sex offender with child pornography, or that he presented an "imminent" risk of reoffense.

Based on his review of Parr's criminal history and behavior, as well as his use of accepted actuarial instruments, Dr. Jensen testified to his opinion that Parr suffered from pedophilia and was more likely than not to engage in future acts of sexual violence due to his pedophilia. Parr does not challenge the admissibility of Dr. Jensen's testimony. Once admitted, that testimony was sufficient to support the jury's verdict. *In re Morgan*, 398 S.W.3d 483, 489-90 (Mo. App. S.D. 2013). To the extent there was a conflict between the testimony of Dr. Jensen and Dr. Simmons as to whether Parr's pedophilia made him more likely than not to commit sexually violent acts in the future, the weighing of the experts' testimony was for the jury. *See*, *e.g.*, *Baughton v. State*, 437 S.W.3d 368, 374 (Mo. App. S.D. 2014); *In re Doyle*, 428 S.W.3d 755, 763 (Mo. App. E.D. 2014).

Finally, the State presented sufficient evidence that Parr had experienced a material change in circumstances subsequent to the 2009 judgment finding that he did not qualify as an SVP; therefore, the current judgment is not barred by collateral estoppel. As we have described in detail above, the opinions of both of the State's experts relied in significant part on Parr's behavior subsequent to the 2009 judgment. As reflected in the letter Parr wrote to a fellow sex offender, subsequent to the 2009 judgment Parr had engaged in multiple high-risk behaviors which indicated that he had not benefitted from the sex offender treatment he had received, and was intentionally pursuing a course of conduct which had led him in the past to commit sexually

violent offenses. Parr was engaging in these behaviors despite the fact that he had suffered serious legal consequences from his past sexual offenses. He denied that the behaviors presented a substantial risk, and also sought to justify his offenses by stating that they had been motivated by a desire to help his victims. Parr had been terminated from an outpatient sex offender treatment program in which he was participating, the therapist concluding that Parr had "made no progress in treatment," and that he was "not amenable to treatment in the community at this time." Parr's behavior in the Jackson County Detention Center exhibited the sort of "internal grievance thinking" which had previously allowed him to rationalize his sexual offenses.

## Conclusion

We affirm the judgment of the circuit court, which found Parr to be a sexually violent predator, and committed him to the custody of the Department of Mental Health.

_____
Alok Ahuja, Chief Judge

All concur.

16