IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,914

In the Matter of the Care and Treatment of
ROBERT J. SIGLER.

SYLLABUS BY THE COURT

1.

Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority or in the face of contrary authority, is akin to failing to brief an issue. When a party fails to brief an issue, that issue is deemed waived or abandoned.

2.

Determining whether res judicata prevents relitigation of a claim requires consideration of the: (1) identity in the thing sued for, (2) identity of the cause of action, (3) identity of the persons and parties to the action, and (4) identity in the quality of the person or persons for or against whom the claim is made.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 2, 2018. Appeal from Barton District Court; MIKE KEELEY, judge. Opinion filed September 6, 2019. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Dwight R. Carswell*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: This appeal results from the State's second attempt to have Robert J. Sigler found to be a sexually violent predator (SVP) and civilly committed under the Kansas Sexually Violent Predator Act (SVPA), K.S.A. 2018 Supp. 59-29a01 et seq. Sigler raises issues about res judicata and collateral estoppel and alleges prejudicial conduct calling for a mistrial. On the first issue, we hold this action is not barred by the res judicata doctrine because a material change of circumstances occurred that differentiates the second action from the first. We also reject Sigler's second argument because, although an error occurred when a witness inaccurately stated that Sigler had been "actually civilly committed once, and then his commitment was overturned by an appeals court," the State and the district court took sufficient curative steps to counter the potential prejudice. The district court, therefore, did not err by not declaring a mistrial.

We thus affirm the district court and the Court of Appeals. See *In re Sigler*, No. 118,914, 2018 WL 5728261, at *1 (Kan. App. 2018) (unpublished opinion).

FACTS AND PROCEDURAL BACKGROUND

In 2007, a district court sentenced Sigler to 84 months' imprisonment following his convictions for criminal sodomy with a child 14 or more years of age but less than 16 years of age, indecent solicitation of a child, and furnishing alcohol to a minor for illicit purposes. In 2013, before Sigler's release from prison, the State petitioned for a civil commitment order under the SVPA.

*The 2015 SVPA trial*

The SVPA action went to trial, after which the district court issued a journal entry of judgment summarizing its conclusions about the four SVP elements. See K.S.A. 2018

2

Supp. 59-29a02(a) (defining "Sexually violent predator" to mean [1] any person convicted of or charged with a sexually violent offense; [2] the person suffers from a mental abnormality or personality disorder; [3] the mental abnormality or personality disorder "makes the person likely to engage in repeat acts of sexual violence"; and [4] the person has serious difficulty controlling his or her dangerous behavior); *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011) ("[These] statutory requirements . . . impose four elements that must be proven to establish that an individual is a sexually violent predator.").

The court noted the parties had not disputed the first element of proof because Sigler had a prior conviction for a sexually violent offense. See K.S.A. 2018 Supp. 59-29a02(e)(4) (defining "Sexually violent offense" to include criminal sodomy). The district court thus focused its analysis on the remaining three elements.

As to the second element—whether Sigler suffered from mental abnormalities supporting his involuntary commitment under the SVPA—both the State and Sigler presented expert testimony. One State expert diagnosed Sigler under the DSM-5 with pedophilia, sexually attracted to males, nonexclusive type; borderline personality disorder, with antisocial features; voyeurism; alcohol dependence, without physiological dependence in a controlled environment; and amphetamine dependence, without physiological dependence in a controlled environment. Another State expert diagnosed Sigler with other specified paraphilic disorder, hebephilia, frotteurism, and voyeurism; other specified personality disorder, histrionic and borderline; methamphetamine use disorder, remission in a controlled environment; alcohol use disorder, remission in a controlled environment; and depressive disorder by history.

Sigler's expert disagreed with these diagnoses, finding "nothing in his current functioning or in his history that would justify" the pedophilia or hebephilia diagnoses.

3

The district court ultimately concluded the State proved Sigler suffers from a mental abnormality or personality disorder beyond a reasonable doubt.

The district court then considered whether the State carried its burden of proving beyond a reasonable doubt that Sigler was likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder—the third element of the SVP definition. Both State experts evaluated Sigler's likelihood of recidivism using the Static-99R, an actuarial risk assessment tool. Both rated Sigler at a risk level of 4, which placed him in the moderate category for reoffending under the Static-99R's scoring criteria. Sigler's expert opined the Static-99R does not reliably assess the risk of reoffending, but if he rated Sigler, he would rate him below a 4. He also opined a score of 4 on the Static-99R is low. The district court found the State failed to meet its burden on this element. In reaching this conclusion, the district court highlighted the Static-99R test results and the State's own expert's recommendation for GPS monitoring and strict supervision even though the same expert had recommended civil commitment in other cases.

The district court finally turned to the fourth element of whether the State proved Sigler has serious difficulty controlling his dangerous behavior. The district court reviewed both sides' experts' testimony and Sigler's testimony about his treatment and efforts to address his past sexually violent behavior. Based on this review, the district court determined the State also failed to prove this element beyond a reasonable doubt and denied the State's petition to commit Sigler.

The district court ordered Sigler released to parole on July 13, 2015. About four months later, Sigler was arrested for parole violations and was returned to prison for a 90-day sanction.

4

*The 2016 petition*

Just before Sigler's release from custody, the State filed a second petition to commit Sigler. In the State's February 29, 2016, petition it alleged Sigler's parole violations constituted a material change in his condition and ability to control his behavior, which supported civil commitment even though the court had previously rejected its commitment petition after the 2015 trial.

Sigler asked the district court to conclude a second proceeding was barred by principles of res judicata or collateral estoppel. The district court analyzed any preclusive bar under *In re Care & Treatment of Sporn*, 289 Kan. 681, 215 P.3d 615 (2009), and *In re Care & Treatment of Johnson*, 32 Kan. App. 2d 525, 85 P.3d 1252 (2004). The district court noted the only new information the State provided was about Sigler's performance on parole and the reported parole violations. But the court determined this evidence was sufficient to find a material change in Sigler's condition since its 2015 determination denying the State's first commitment petition. The district court specifically cited Sigler's use of Facebook and viewing pornography within one month of being released on parole as violations of his parole conditions. The district court also noted violations arising from Sigler's possessing an Instagram account that he used to view explicit material, viewing of child pornography, and having a consensual sexual relationship with an adult male without first obtaining a required third-party notification. Based on these facts, the district court determined res judicata did not bar a second commitment proceeding.

The district court held a jury trial in February 2017. The State called several witnesses who had contact with Sigler during his parole and two experts. Sigler testified on his own behalf and called his own expert.

Logan Hall supervised Sigler's parole. In August 2015, Hall confronted Sigler about Sigler's Facebook profile. Hall believed this to be a parole violation. Sigler's parole conditions barred the use of chat rooms, bulletin boards, or social networking sites, including Facebook, "for the purpose of accessing sexually explicit or erotic material or contacting any person for purposes of sexual gratification." While Sigler had a Facebook page, no evidence in the record establishes he used it in a manner restricted by his parole conditions.

Sigler, however, did violate another parole condition in September 2015 by driving a coworker, who was a minor, home after work. The next day, Sigler learned the coworker was in high school. Being alone with a minor violated Sigler's parole conditions. Sigler disclosed the violation to Hall who described this as "a fairly minor violation."

In November 2015, Hall learned Sigler opened an Instagram account. Hall and Brandi Laudermilk, who oversaw Sigler's sex offender treatment program while he was on parole, viewed pages, profiles, or accounts Sigler had liked, friended, or followed. This review revealed images of males partially or completely nude. Sigler later admitted to viewing pornographic websites, some of which may have depicted male minors between the ages of 14 and 17. Sigler also admitted he masturbated while looking at the material. Hall had recommended Sigler's probation be revoked.

Laudermilk addressed the reasons Sigler was discharged from his sex offender treatment program while on parole. She characterized Sigler as having trouble maintaining a low risk of reoffending while under treatment. His Instagram account, which led to the seizure of his computer, prompted the discharge from the program. But Sigler also did not disclose information relevant to his treatment, such as sexually arousing dreams involving children. She testified she had discussed the risk of viewing

6

pornography with Sigler. She described the sex-offending cycle and methods she discussed with Sigler to stop such behaviors at thoughts before they became fantasies and later progressed into actions. Laudermilk was concerned the behavior she observed revealed Sigler was at a heightened risk of reoffending. She noted that Sigler had deactivated his Facebook account when questioned about it but reactivated it later that same night.

Laudermilk testified she used the Acute 2007 and Stable 2007 assessments as scoring guides to determine Sigler's risk of recidivism while under supervision. The Acute 2007 test was done weekly to assess Sigler's current risk. From the time Sigler started treatment, the test showed his risk was moderate or high each time it was administered. These results were higher than Sigler's results on the Acute 2007 administered during Sigler's first incarceration.

Forensic psychologist Derek Grimmell, Ph.D., testified as a State expert. Grimmell evaluated Sigler's file and wrote a report detailing his conclusions that the district court admitted into evidence. Grimmell explained the factors he considered in assessing Sigler's likelihood to reoffend, including:  the number of times Sigler victimized others; the choice of male victims; Sigler's paraphilic disorder—his attraction to pubescent boys over a long time; and Sigler's other specified personality disorder with histrionic and borderline features.

Grimmell testified inaccurately that

"this case is more dramatic than most because [Sigler] was actually civilly committed once, and then his commitment was overturned by an appeals court. And a lot of guys would have said, wow, that was a real shot across my bow. I better be careful on parole. But not Mr. Sigler."

7

Sigler later testified he had never appealed an adverse civil commitment judgment.

Grimmell also testified to another parole violation Hall had not covered in his testimony: Sigler engaged in a consensual sexual relationship with an active drug user in a manner that violated parole because he did not obtain a required third-party notification before doing so. Grimmell identified this behavior as "a substantial increase in [Sigler's] risk."

Grimmell assessed Sigler's likelihood to reoffend under the Static-99R. Grimmell scored Sigler a plus 4, which he described as an above average risk category. Grimmell opined Sigler was a high risk to reoffend based on his review of Sigler's risk factors, the data in Sigler's file, and impediments to Sigler controlling his behavior. Grimmell cited Sigler's violations over the four-and-a-half month parole period as additional information he relied on in reaching his conclusion Sigler was likely to reoffend.

Mitchell Flesher, Ph.D., a licensed psychologist, also assessed Sigler under the Static-99R. He scored Sigler a 4. According to Flesher, this score placed Sigler in the high risk priority. (Different experts treated the score of 4 differently, assessing the score as suggesting a risk of reoffending anywhere from low to high.)

Sigler, besides his own testimony, offered expert testimony from clinical psychologist Bruce Nystrom, Ph.D., who opined Sigler did not meet the definition of a sexually violent predator. Nystrom did not report a Static-99R score but noted Sigler fell in the moderate-to-high risk for reoffending. Nystrom disagreed that Sigler showed any symptoms of a typical mental illness. He did, however, diagnose Sigler with histrionic personality disorder. Nystrom did not see this diagnosis as predicting any type of offensive behavior or indicating Sigler was a danger to the public.

8

The court's instructions to the jury acknowledged the existence of a prior civil commitment proceeding against Sigler:

> "In 2013 a petition seeking to involuntarily commit Robert J. Sigler as a sexually-violent predator was filed and was ultimately denied. Do not speculate or otherwise concern yourselves with any potential reasons for any decisions in a prior petition. The present case should be decided upon the facts and circumstances admitted in the present case. You should consider and weigh all admitted evidence in the present petition as a whole and render a decision that is independent of any prior petition."

The jury determined Sigler was a sexually violent predator after less than an hour of deliberations.

Sigler appealed. Sigler claimed that, because the experts scored his level of risk on the Static-99R similarly in both the proceedings, the State failed to show a change—let alone a material change—in his mental status or level of risk. Sigler thus argued res judicata or collateral estoppel barred the current proceeding. The Court of Appeals panel rejected the State's contention that Sigler's viewing of apparent child pornography constituted a material change under *Sporn*, but it found these factors sufficient to establish a material change:

- The dissonance between the steps Sigler took while in prison to help control his actions and the lack of effort he made while on parole, including "evidence that Sigler began having fantasies about naked children but refused to discuss these fantasies with his counselor." *In re Sigler*, 2018 WL 5728261, at *3.

- Testimony from Sigler's counselor that, based on weekly Acute 2007 testing, "Sigler's risk changed from moderate to high in the time he was attending counseling." 2018 WL 5728261, at *3.

9

- "The Static-99R score does not change over time because it is based on static conditions such as lifelong personality disorders and lifelong deviant sexual interests. Thus, a consistent score of a four on the Static-99R test does not mean that there was no change in Sigler's mental condition, but rather that his personality risk remained high despite treatment." 2018 WL 5728261, at *4.

- Sigler's "unwillingness to seek help in the community." 2018 WL 5728261, at *4.

In a second issue on appeal, Sigler claimed that Grimmell's inaccurate statements about the first KVPA proceeding were so prejudicial as to warrant a mistrial. The panel rejected Sigler's argument. It reasoned that several circumstances combined to cure Grimmell's erroneous testimony, including the court's instruction that informed the jury that the State's prior petition was denied. 2018 WL 5728261, at *4.

Sigler timely petitioned for review, which this court granted. This court's jurisdiction is proper under K.S.A. 20-3018(b) (petition for review of Court of Appeals decision).

ANALYSIS

Sigler's petition for review presents two issues. First, he argues the Court of Appeals erred in concluding the State carried its burden of establishing that Sigler's mental status and risk assessment materially changed between the first and second SVPA proceedings. Second, he argues the Court of Appeals erred when it concluded the district court did not violate Sigler's right to due process when it failed to sua sponte declare a mistrial after Grimmell incorrectly advised the jury that Sigler's previous civil commitment had been overturned on appeal.

10

1. *The State has established a material change in circumstances.*

In presenting his first issue, Sigler makes a preliminary argument that this court has ruled that K.S.A. 59-29a03 allows only one SVP commitment proceeding against an individual. He alternatively argues that, if the statute allows two proceedings, res judicata or collateral estoppel bar the second proceeding against him. We reject both arguments.

    1.1. *Sigler fails to preserve his first argument.*

Sigler argues in his petition that K.S.A. 59-29a03(a)(1) generally authorizes only one SVP commitment proceeding. K.S.A. 2018 Supp. 59-29a03 provides:

> "(a) When it appears that a person may meet the criteria of a sexually violent predator as defined in K.S.A. 59-29a02 and amendments thereto, the agency with jurisdiction shall give written notice of such to the attorney general and the multidisciplinary team established in subsection (d), 90 days prior to:

> (1) The anticipated release from total confinement of a person who has been convicted of a sexually violent offense, except that in the case of persons who are returned to prison for no more than 90 days as a result of revocation of postrelease supervision, written notice shall be given as soon as practicable following the person's readmission to prison."

Here, the State gave notice of this proceeding after Sigler was returned to prison for violating his parole. But it was a second proceeding, and Sigler objects to the State having multiple opportunities to seek his civil commitment. But he does not develop any arguments based on the statutory language. Instead, his arguments focus on the test against which this court measured whether the State met its burden in *Sporn*. There, we

11

held the State had failed to prove a material change in circumstances and a second SVPA action was therefore barred by the res judicata doctrine. 289 Kan. at 688-89. But at oral argument, Sigler's counsel reiterated the argument that K.S.A. 59-29a03 allows only one SVPA proceeding.

Upon questioning, Sigler's counsel conceded she had not made a statutory interpretation argument. As a result, Sigler has waived any such argument. See *State v. Gonzalez*, 307 Kan. 575, 592, 412 P.3d 968 (2018) ("Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority or in the face of contrary authority, is akin to failing to brief an issue. When a party fails to brief an issue, that issue is deemed waived or abandoned."). Instead, Sigler's counsel argued this court foreclosed the second action through our decision in *Sporn*. But counsel misreads *Sporn*.

Granted, *Sporn* acknowledged an ambiguity in K.S.A. 59-29a03(a)(1) about whether the statute allows the State to file a second proceeding after revocation of a person's postrelease supervision. And we noted "the language of the SVPA could be interpreted to authorize one commitment proceeding during the pendency of the 'complete sentence' for a sexually violent offense." 289 Kan. at 687. But we did not resolve the ambiguity. Instead, we stated:

> "[E]ven if we accept the State's contention that a second petition for commitment under the SVPA is permitted where there has been a material change in the respondent's mental status and recidivism risk, the State failed to carry its burden of making an initial showing of such a material change." 289 Kan. at 689.

This final sentence conveys that we ultimately resolved *Sporn* on the basis that the State established no material change in condition—the sole basis the State had presented as a

12

justification for a second action. In other words, we did not resolve the ambiguity and did not hold that K.S.A. 59-29a03(a)(1) allows only one proceeding. That question is left for another day.

Second, we did not adopt a material change of circumstances as a test. Rather, we held the State had not met the material change threshold it set for itself. The parties here similarly use the material change of circumstances as a test. Other than arguing we foreclosed a second action in *Sporn*, Sigler has not argued the material-change test is inappropriate or that a different test should apply. He has thus waived that argument. See *Gonzalez*, 307 Kan. at 592. We, thus, apply the test as the one argued without deciding its appropriateness.

This brings us to the issue Sigler did argue:  Whether the State established a material change in condition as necessary to overcome a potential res judicata or collateral estoppel bar. This issue statement notably contains two theories of preclusion against the second SVPA proceeding—res judicata and collateral estoppel.

We have recognized collateral estoppel and res judicata as distinct, albeit closely related, doctrines barring relitigation of prior adjudications. See *Waterview Resolution Corp. v. Allen*, 274 Kan. 1016, 1023, 58 P.3d 1284 (2002) ("While the concept of res judicata is broad enough to encompass both claim preclusion and issue preclusion, the modern trend is to refer to claim preclusion as res judicata and issue preclusion as collateral estoppel."). "Claim preclusion is a common-law doctrine, designed to prevent relitigation of a final judgment." *In re Tax Appeal of Fleet*, 293 Kan. 768, 777, 272 P.3d 583 (2012). In contrast, "[i]ssue preclusion prevents a second litigation of the same issue between the same parties, even when raised in a different claim or cause of action." 293 Kan. at 778. However, the requirements that must be met "before a party will be estopped from collaterally attacking a prior adjudication" (issue preclusion) are different from the

13

conditions required for res judicata (claim preclusion). *Waterview*, 274 Kan. at 1023 (citing *Regency Park v. City of Topeka*, 267 Kan. 465, 478, 981 P.2d 256 [1999] [discussing requirements for res judicata and collateral estoppel]).

### 1.2 *Sigler has not preserved a collateral estoppel issue.*

In the district court, Sigler referred to collateral estoppel. He makes a passing reference to his district court argument in his appellate brief, although he focused on the framework established in *Sporn*. But in *Sporn*, we applied the res judicata doctrine; we did not discuss collateral estoppel. 289 Kan. at 685-89. Granted, other courts have framed the issue as one of issue preclusion or collateral estoppel. See *In re Johnson*, 32 Kan. App. 2d at 530-31; *Commonwealth v. Chapman*, 444 Mass. 15, 20-24, 825 N.E.2d 508 (2005); *Parr v. State*, 482 S.W.3d 508, 511-14 (Mo. App. 2016); cf. *In re Fleet*, 293 Kan. at 777-78 (discussing areas of overlap between claim and issue preclusion in context of KJRA proceeding).

Recognizing these authorities and our own decisions, perhaps a party could argue that an issue-preclusion doctrine other than res judicata applies when the State brings successive SVPA proceedings. But Sigler made no effort before this court or the Court of Appeals to explain how the doctrines differ or why the results might differ depending on which preclusion doctrine a court analyzes. Instead, he relied on *Sporn*. He has thus waived any argument based on a theory of collateral estoppel. See *Gonzalez*, 307 Kan. at 592. We therefore limit our discussion to whether a material change authorized a second proceeding to commit Sigler under the res judicata framework laid out in *Sporn* without addressing whether the result could differ under a collateral estoppel analysis.

1.3. *The State presented evidence of a material change.*

Sigler has presented and preserved an argument based on *Sporn* by contending the State did not present evidence of a material change in his mental state or risk assessment between the two proceedings. This question, which underlies whether res judicata bars a second SVPA proceeding, presents an issue law. An appellate court exercises unlimited review over a district court's decision on a question of issue preclusion and makes a de novo determination. See *In re Tax Appeal of Fleet*, 293 Kan. at 777; see also *Bogguess v. State*, 306 Kan. 574, 579-80, 395 P.3d 447 (2017); *Sporn*, 289 Kan. at 686.

Here, we base our de novo determination on the res judicata factors discussed in *Sporn*: "res judicata prevents relitigation where the following requirements are met: (1) identity in the thing sued for, (2) identity of the cause of action, (3) identity of persons and parties to the action, and (4) identity in the quality of persons for or against whom claim is made." 289 Kan. at 686. "An issue is res judicata when [these] four conditions concur." *Regency Park*, 267 Kan. at 478. That is, a change in any one of these conditions may render res judicata inapplicable. See 267 Kan. at 478 ("[T]here cannot be res judicata because of lack of identity in the parties to the action.").

In *Sporn*, as here, the State focused on the second requirement and argued its first cause of action against Randy Sporn to determine his then-current condition was not identical to the second action which would assess his condition at the time of the later action. Specifically, it argued: "'The sole issue is whether the individual's mental status and, consequent risk, have changed since the last petition for any reason. If they have not, no new issue is presented and res judicata is properly invoked to bar the proceeding.'" 289 Kan. at 687.

15

Here, the State has effectively made the same argument. The State did not plead or argue that Sigler has committed or been charged with another sexually violent offense. Nor has it argued the existence of a different mental abnormality or personality disorder that makes it likely Sigler will engage in repeated acts of sexual violence. Instead, it focused on the final factor in the SVP definition to argue a material change has occurred that evidences Sigler now has serious difficulty in controlling his dangerous behavior even though the evidence at the first trial showed he was then in control of his impulses. This argument parallels the State's "consequent risk" argument in *Sporn*.

The *Sporn* court noted that *Turner v. Superior Court*, 105 Cal. App. 4th 1046, 130 Cal. Rptr. 2d 300 (2003), might have supported the State's position that such a material change would overcome the potential bar of the res judicata doctrine. *Sporn*, 289 Kan. at 688. In *Turner*, the California court allowed a successive proceeding, reasoning "a mental disorder is not a fixed condition because an individual's mental health and potential dangerousness can, and frequently does, change." *Turner*, 105 Cal. App. 4th at 1058. The *Turner* court held the first jury's determination that James William Turner was not an SVP was relevant and admissible but not determinative. 105 Cal. App. 4th at 1059-60.

The *Turner* court held the State failed to meet its burden of establishing a serious and well-founded risk that Turner will engage in sexually violent criminal conduct upon release. The State's evidence relied exclusively on two psychologists. One did not address the prior jury's verdict; the other noted the verdict but failed to discuss the verdict's consequences. *Turner* clarified that, since there had been a prior jury determination, the experts must accept that result as true. They must "then explain why despite that prior finding, the facts are sufficiently different so that the individual is now a dangerous person who is likely to reoffend within the meaning of the SVPA." 105 Cal. App. 4th at 1062. The *Turner* court also noted neither psychologist relied on developments after the

16

first proceeding to support their conclusions Turner was likely to reoffend. 105 Cal. App. 4th at 1062-63.

In *Sporn*, applying the reasoning in *Turner*, we concluded the State failed to carry its burden to establish a material change in Sporn's mental status and risk assessment. We noted no discussion of a material change in the second petition to commit Sporn. 289 Kan. at 689. We continued our analysis by considering the facts alleged to support finding a material change:

> "Further, we are unpersuaded by the State's argument that the basis for revoking postrelease supervision—viewing pornography and sexually explicit websites on the computer—define a material change in Sporn's mental status. To the contrary, those facts appear to be offered simply to shore up or corroborate the previous diagnosis and risk assessment, with the hope that a second jury would reach a different result on the same underlying evidence. That is precisely what the principle of res judicata is designed to prevent." 289 Kan. at 689.

No Kansas cases appear to have elaborated on what constitutes a material change in mental status or risk assessment. The panel here considered *Sporn* and *Turner* and cited three cases from other jurisdictions in analyzing what constitutes a material change. The facts and analysis of the cases from our sister states help frame the considerations.

In one of the cited cases, *Chapman*, 444 Mass. 15, the Massachusetts Supreme Court vacated a trial judge's order finding collateral estoppel barred a second proceeding and dismissing a petition to commit Wayne Chapman as a sexually dangerous person. The court determined the petition was not barred by collateral estoppel and the petition presented a sufficient factual basis to support the allegations Chapman was presently sexually dangerous. 444 Mass. at 15-16.

17

Chapman had been convicted of various offenses and transferred from prison to a treatment center based on a finding that he was a sexually dangerous person. A judge later found the Commonwealth failed to prove beyond a reasonable doubt that Chapman remained a sexually dangerous person and ordered his return to prison. Before Chapman's scheduled release from prison more than a decade later, the Commonwealth filed a new sexually dangerous person petition.

The court compared the factual allegations underlying the initial determination and those raised in the second proceeding to determine whether collateral estoppel applied. 444 Mass. at 20-22. The court found sufficient allegations to overcome collateral estoppel when the Commonwealth offered evidence that the treatment Chapman received before the first proceeding had proved ineffective for sex offenders and evidence that Chapman's failure to participate in sex offender treatment programs since the first proceeding impacted his "present ability to control a mental abnormality (pedophilia) that otherwise creates a substantial risk of additional sex offenses." 444 Mass. at 23-24.

The panel also cited *Parr v. State*, 482 S.W.3d 508 (Mo. App 2016). There, Missouri sought to commit Gregory Parr before his scheduled release on sexual offenses involving a 14 year old. Parr presented evidence that he did not meet the requirements of a sexually violent predator. The trial court agreed, granting Parr a directed verdict at the close of the State's evidence. Later, Parr's parole was revoked after he sent a letter to an incarcerated sex offender.

On appeal, Parr styled his argument as sufficiency of the evidence, not collateral estoppel. The Missouri Court of Appeals reframed the issue as one of collateral estoppel, which does not preclude later litigation of the same issue "if the facts have materially changed between the first and second adjudications." 482 S.W.3d at 512. The court noted other states had applied similar reasoning to conclude later proceedings were not barred

18

in the SVP context, citing *Turner*, *Sporn*, *Chapman*, and *In re Thomas R.*, 224 Ariz. 579, 233 P.3d 1158 (Ct. App. 2010). The Missouri court, relying on this precedent and its state's collateral estoppel rules, concluded the State could proceed if it proved materially changed circumstances or a new legal situation since the prior adjudication. And the State could partially rely on facts predating the prior adjudication as long as those facts were not the sole basis for arguing the individual is a sexually violent predator. 482 S.W.3d at 514-15.

The Missouri court then considered whether the evidence supported the trial court's decision to commit Parr as a sexually violent predator. The principal new evidence was Parr's letter to the incarcerated sex offender. The letter detailed Parr's continued attraction to people appearing to be below the age of majority. Parr also sent images of young people, including an 18-year-old pornographic film star and one of Parr's former victims. A therapist ended Parr's participation in sex offender treatment after his letter was discovered because Parr had "made no progress in treatment and [was] not amenable to treatment in the community at this time." 482 S.W.3d at 516. Parr also admitted to parole violations, "including associating with felons; using the internet for purposes other than looking for work; viewing or collecting pictures of young boys for sexual arousal; visiting the Facebook and MySpace social media websites; and searching the internet for pornography and viewing pornography." 482 S.W.3d at 516. The State and Parr each presented expert testimony supporting their positions on whether Parr was a sexually violent predator.

The Missouri court affirmed the trial court's judgment finding Parr to be a sexually violent predator. In doing so, the court held the State presented sufficient evidence of a material change in circumstance since the first judgment in Parr's favor. The court summarized the evidence supporting this conclusion, which included the State's experts' testimony; Parr's letter; and Parr's behavior after the first judgment suggesting Parr had

19

not benefitted from sex offender treatment and continued to pursue a course of conduct that had led to his commission of sexually violent offenses in the past.

Finally, in *In re Thomas R.*, 224 Ariz. 579, the Arizona court relied on *Turner*'s changed-circumstances reasoning in evaluating whether a second commitment proceeding was barred by res judicata or collateral estoppel. The Arizona opinion, much like that in *Parr*, highlighted the new evidence supporting its conclusion of a material change since the earlier proceeding. In particular, the court discussed a State expert's recent examination of Thomas R. and the conclusion the expert drew based on that examination as well as Thomas R.'s many probation violations after the first attempted commitment proceeding. 224 Ariz. at 586-87.

*Turner*, *Chapman*, *Parr*, and *In re Thomas R.* support the State's argument it is not precluded from bringing a second action if circumstances show a material change in the risk factor of an individual's ability to control his or her behavior. Common circumstances in the cases include a failure to succeed in a treatment program, probation or parole violations, not being amenable to treatment in the community, and escalating risky behavior that shows an inability to control actions.

Citing similar evidence at Sigler's trial, the Court of Appeals panel found a material change permitted the State's second commitment petition. The panel interpreted *Sporn* to preclude such a conclusion based solely on viewing pornography or sexually explicit material. But the panel distinguished Sigler's situation from that in *Sporn* because the State did not rely solely on Sigler viewing these materials. Instead, the panel compared the evidence about Sigler's ability to control his actions in prison with his inability to do so since his release to the community. The panel also highlighted Sigler's failure to disclose fantasies to his counselor and the weekly administered Acute 2007 testing showing Sigler's risk of reoffending had increased from moderate to high even

while attending counseling. These changed circumstances led the panel to conclude: "The proceedings in the State's current action were sufficiently different from those in the prior action for neither res judicata nor collateral estoppel to apply. The district court did not err in denying Sigler's motion to dismiss." *In re Sigler*, 2018 WL 5728261, at \*4.

Before us, Sigler challenges the characterization of some of his alleged parole violations, pointing out the parole conditions did not preclude Sigler having a Facebook account as long as he did not use it in a prohibited manner and Hall's characterization of Sigler's self-disclosed driving of a minor as "a fairly minor violation." Sigler further points to the fact that he has not committed or been charged with a new offense— sexually explicit or otherwise. Sigler makes valid points with these arguments. He then tries to fit this case into the confines of *Sporn*. He, in essence, argues all that is left is his viewing of explicit material. He then relies on the following statement from *Sporn* to argue the State has failed to carry its burden:

> "[V]iewing pornography and sexually explicit websites on the computer [does not] define a material change in Sporn's mental status. To the contrary, those facts appear to be offered simply to shore up or corroborate the previous diagnosis and risk assessment, with the hope that a second jury would reach a different result on the same underlying evidence." 289 Kan. at 689.

The State conditionally cross-petitioned to ask us to abrogate this language. Alternatively, it points to other evidence showing a material change in his risk of reoffending. We need not go as far as the State asks because we agree with the State's alternative argument that it has established more than Sigler's attraction to pornography. It established two parole violations—(1) having an Instagram account and using it to view pornography and (2) having a consensual sexual relationship with an adult male without first obtaining a required third-party notification. Granted, one of the violated parole conditions aimed to prevent Sigler viewing pornography. But the violation proves

more than a tendency to view pornography. His failure to comply with parole conditions, knowing he risked incarceration, reveals an inability to control his actions.

Sigler also emphasizes the lack of change in his mental status based on the relative consistency among the various diagnoses provided at the two proceedings. Even if we accept Sigler's argument that his diagnoses remain unchanged, he misses the point. *Sporn* did not limit consideration of a material change to the mental status—the material change can be in the mental status *or* the risk assessment. And *Sporn* acknowledged both are variable; neither is fixed. So we must look at the evidence of the mental status or risk assessment as it exists at the time of the State's second petition. See *Sporn*, 289 Kan. at 688-89. Here, the State presented evidence of a material change in the risk assessment based on Sigler's behavior on parole and the results of his evaluations under the Acute 2007. These tests showed his risk assessment to be low to moderate while attending sex offender treatment while incarcerated. But after his release into the community, in a fairly short time period, his risk level increased from moderate to high. And Laudermilk testified Sigler was not fully participating in treatment. She testified Sigler was having fantasies about naked children but he refused to discuss these fantasies with her. She explained how this evidenced a progression on the sex-offending cycle.

Sigler's case is distinguishable from *Sporn*. The State here laid out the basis for establishing a material change in its petition. It also presented evidence of problematic behavior while on parole that reflected an increased risk of Sigler reoffending, although some of that behavior may not have risen to the level of a violation. And, as discussed, the State showed Sigler's risk assessment, as reflected by the Acute 2007 testing, had increased since his release from prison and consistently remained moderate to high after that release. Here, the State has presented sufficient evidence to show a material change. The district court did not err in concluding the res judicata doctrine did not bar the second proceeding and allowing the case to proceed to trial.

2. *The district court did not violate Sigler's right to due process.*

The second issue arises from the State's witness' testimony about Sigler having appealed his civil commitment. Grimmell testified:

"[T]his case is more dramatic than most because he was actually civilly committed once, and then his commitment was overturned by an appeals court. And a lot of guys would have said, wow, that was a real shot across my bow. I better be careful on parole. But not Mr. Sigler."

On cross-examination, Grimmell admitted he did not know what had happened in the previous proceeding but had made an assumption. The next day, Sigler testified he had not previously been committed and had not taken a prior appeal. No witness testified to what happened in the prior proceeding.

Sigler's counsel did not object to Grimmell's testimony, and he did not request a mistrial. But on appeal Sigler argues the district court had a duty to sua sponte declare a mistrial because of the prejudicial nature of the information. The Court of Appeals panel held that Sigler waived this issue by not objecting at trial. *In re Sigler*, 2018 WL 5728261, at *4 (citing *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]). Alternatively, the panel held a fundamental failure in the proceeding had not occurred because any prejudice caused by the statements could be—and was—cured or mitigated with an instruction from the court. The panel thus concluded the district court did not err. 2018 WL 5728261, at *4.

We next consider both alternatives discussed by the panel.

2.1 *Sigler did not waive the issue.*

The State argued, and the Court of Appeals agreed, that the contemporaneous objection rule precludes Sigler's argument. Under this rule, codified at K.S.A. 60-404,

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

We cautioned in *King*, "From today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims . . . must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." 288 Kan. at 349. Since then, we have invoked the contemporaneous objection rule to bar review even when a party asserts the evidentiary claim implicates due process. *State v. Solis*, 305 Kan. 55, 63-64, 378 P.3d 532 (2016).

Even so, using K.S.A. 60-404 here is like pushing a round peg into a square hole. K.S.A. 60-404 governs appeals relating to the erroneous admission of evidence. But Sigler's issue is with the failure of the district court to declare a mistrial. And neither K.S.A. 60-404 nor any other authority requires an objection before a district court considers whether to declare a mistrial. As to the appeal, our review is about whether the district court should have acted because of undue prejudice. We thus hold the State cannot rely on K.S.A. 2018 Supp. 60-404 to establish a preservation problem with Sigler's argument.

2.2 *The district court did not abuse its discretion by not granting a mistrial.*

In arguing the district court should have declared a mistrial, Sigler relies on principles taken from criminal law. In doing so, he acknowledges an SVPA commitment proceeding is civil, with some procedural protections to assure a respondent receives due process that resembles protections afforded defendants in criminal proceedings. To support this proposition, he relies on *In re Care & Treatment of Sykes*, 303 Kan. 820, 824, 367 P.3d 1244 (2016); *In re Care & Treatment of Hay*, 263 Kan. 822, 831, 953 P.2d 666 (1998). Sigler then asks this court to analogize Grimmell's disclosure to criminal cases in which a mistrial was required based on disclosure a criminal defendant had been convicted of the same offense in a previous trial. Sigler cites this line of cases, beginning with *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978), for the proposition that "exposure of jurors during a retrial to the fact of a defendant's conviction in a first trial deprives the defendant of a fair trial."

We assume without deciding that Grimmell's testimony can be fairly analogized to cases addressing the effect of evidence about a criminal defendant's prior conviction of the same offense at a previous trial. *Williams* and similar cases hold the prejudicial nature of the evidence prevents a fair trial. Kansas law similarly recognizes that prejudicial conduct in or out of the courtroom may make it impossible to proceed without injustice to one of the parties. See K.S.A. 22-3423(1)(c); see also K.S.A. 2018 Supp. 21-5110; *In re Bowman*, 309 Kan. 941, 441 P.3d 451 (2019). In such cases, a district court must consider two questions in determining whether to grant a mistrial: (1) whether a fundamental failure occurred in the proceeding, and (2) if so, whether it is possible to continue without an injustice. We review for abuse of discretion both the district court's consideration of—or more accurately here, failure to consider—these issues and its ultimate determination of whether to grant a mistrial. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011). An abuse of discretion occurs when the ruling is arbitrary,

25

fanciful, or unreasonable; based on error of law; or based on error of fact. *State v. Kleypas*, 305 Kan. 224, 268-69, 382 P.3d 373 (2016). And we review whether a party's constitutional right to due process has been violated as a question of law subject to de novo review. See *In re Sykes*, 303 Kan. at 823.

Applying this standard here, we conclude the district court did not abuse its discretion when it did not sua sponte recognize that the trial could not continue without an injustice after Grimmell's inaccurate testimony. We agree that an error occurred. Grimmell testified to inaccurate information. And we agree this information was prejudicial. But Sigler does not meet the second requirement of establishing that the district "court abuse[d] its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice." *Ward*, 292 Kan. at 551.

To explain why, it is necessary to consider our caselaw discussing the Fifth Circuit Court of Appeals decision in *Williams* on which Sigler relies. In *Williams*, the Fifth Circuit stated it was "hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged." 568 F.2d at 471. The *Williams* court viewed the evidence as so prejudicial the court could not mitigate its harm through a curative instruction or admonition. 568 F.2d at 471. As Sigler argues, other courts have adopted *Williams'* view. This includes the Delaware Supreme Court in *Hughes v. State*, 490 A.2d 1034, 1046-47 (Del. 1984), that Sigler cites. But Sigler ignores the fact that this court took a different view in *State v. Cook*, 281 Kan. 961, 969, 135 P.3d 1147 (2006), and *State v. Farrar*, 103 Kan. 774, 777, 176 P. 987 (1918).

In *Cook*, we summarized our holding in *Farrar* by stating that "information that the defendant had been convicted of the same crime in a previous trial 'does not naturally or necessarily tend to corrupt the deliberations of a jury, presumably regardful of their

oaths and the instructions given by the court . . . .'" *Cook*, 281 Kan. at 969. The *Cook* court embraced the *Farrar* principle even after considering *Williams* and similar cases from other jurisdictions, including the Delaware Supreme Court case Sigler cites. See *Cook*, 281 Kan. at 978; see also *Cook*, 281 Kan. at 975 (discussing *Hughes*, 490 A.2d 1034).

We see nothing that requires a different result here. On cross-examination, Grimmell testified he had merely assumed the information and he lacked knowledge about what happened. Then, Sigler rebutted Grimmell's testimony. And both Sigler and the State explained during their opening statements and closing arguments that Sigler had not been committed during the first proceeding. While these arguments are not evidence, the State's endorsement of the evidence submitted through the testimony of Sigler rather than through its own witness significantly undercuts the harm. Finally, the district court instructed the jury:  "In 2013 a petition seeking to involuntarily commit Robert J. Sigler as a sexually-violent predator was filed and was ultimately denied. Do not speculate or otherwise concern yourselves with any potential reasons for any decisions in a prior petition."

In short, Grimmell's inaccurate testimony is problematic but not so prejudicial that the district court abused its discretion by not sua sponte granting a mistrial. The effective cross-examination of Grimmell; Sigler's testimony; the State and Sigler's opening and closing statements; and, most significantly, the court's instruction cured the false impression created by Grimmell's testimony. The district court did not err by failing to declare a mistrial, and the Court of Appeals did not err in affirming that decision.

CONCLUSION

In conclusion, the State carried its burden of establishing a material change in circumstances that prevented application of the res judicata doctrine. And the district court did not err in failing to sua sponte declare a mistrial.

We affirm the district court and the Court of Appeals.

NUSS, C.J., not participating.
MICHAEL J. MALONE, Senior Judge, assigned.[1]

* * *

JOHNSON, J., dissenting: I disagree with the majority's avoidance of the question of the State's statutory authority under the Kansas Sexually Violent Predator Act (SVPA), K.S.A. 2018 Supp. 59-29a01 et seq., to file serial petitions to civilly commit Sigler while he was serving but one sentence for a sexually violent crime. Further, I disagree with the majority's assessment that there was a material change in circumstances.

Sigler cited to our decision in *In re Care & Treatment of Sporn*, 289 Kan. 681, 215 P.3d 615 (2009), to argue that K.S.A. 59-29a03(a)(1) authorized only one SVPA commitment proceeding. In *Sporn*, we said:

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 118,914 vice Justice Nuss under the authority vested in the Supreme Court by K.S.A. 20-2616.

"As we have suggested, the language of the SVPA could be interpreted to authorize one commitment proceeding during the pendency of the 'complete sentence' for a sexually violent offense. For example, K.S.A. 59-29a03(a)(1) speaks to '[t]he anticipated release from total confinement of a person who has been convicted of a sexually violent offense.'" 289 Kan. at 687-88.

*Sporn* noted that "'[t]he interpretation of a statute is a question of law over which this court has unlimited review. An appellate court is not bound by the trial court's interpretation.'" 289 Kan. at 683-84. Given that we have before us the statute to be interpreted, the result desired by the appellant, and the authority to review the question without limit, I do not know why we do not finish what we started in *Sporn*. It was unnecessary to definitively answer the statutory question in that case, but it is necessary to do justice in this case.

If we were to address whether the State exceeded its authority to commit Sigler for what very well may be a life sentence, I would hold that the SVPA should be interpreted to permit the State but one bite of the apple, i.e., it can have one SVPA commitment proceeding per one complete sentence for a sexually violent offense.

But if I were to reach the material change in circumstances question, I would abide by what we said in *Sporn*. Viewing pornography and sexually explicit websites on the computer were facts offered "to shore up or corroborate the previous diagnosis and risk assessment" in the hope of getting a different result in the second proceeding. 289 Kan. at 689. The other fact relied upon by the majority relating to a consensual adult relationship simply cannot carry the weight to which it is assigned. Slip op. at 8. I would reverse and remand with instructions to dismiss the proceedings.